Good morning and may it please the court, Miles Schreiner for the lead plaintiff appellant Norman Hines. The Supreme Court in Mills explained that Section 14A's purpose is to ensure full and fair disclosure to shareholders. That did not happen here. The proxy omitted all of Tesco's financial projections for 2019 through 2022 and cash flow projections for all years despite the fact that such projections have been consistently deemed important to shareholders. It also omitted a fundamental valuation analysis performed by Tesco's financial advisor that's routinely disclosed in merger proxy statements, the transactions analysis. Now the district court concluded as a matter of law on a motion to dismiss that those omissions were permissible. And we submit that it conducted a flawed analysis based heavily on unpublished district court opinions. As the 8th Circuit recently explained in Campbell, which involved a similar 14A claim, many district courts are conducting the wrong inquiry. The 8th Circuit elaborated that unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face up. In this case, important cards were concealed. And why stop at 2022? Why wouldn't, why don't they have an obligation under 14A to do projections from 2023 to 2053? Well it's not an obligation as to what management was required to project, but that's what they chose to do. We know that the projections went out to 2022, and our position is that by voluntarily electing to disclose some projections, they assume the duty and obligation to provide complete disclosure of the projections that were readily available and could have been included in the process. So it's like open file discovery basically. Anything they've got they have to put into the proxy statement? No, and that's not our argument. So I guess what I'm wondering is what is the limiting principle? If they have it and they don't disclose it, why would 14A stop short of liability? Well, I think the important factor in this case is we've also alleged that the omitted numbers were inconsistent with the disclosed numbers for 2017 and 2018. That was based on the expected trends in the oil industry, and we arrived at that conclusion with the help of a valuation expert, which his findings. Did you allege that they had some sort of proprietary understanding of the oil trends that you couldn't have figured out from looking at oil markets? No, but I think the law is pretty well settled that shareholders aren't required to go sift through the entire public domain to find material information, particularly when it's readily available in the possession of directors who are fiduciaries to the shareholders. And again, they elected voluntarily to disclose projections and talk about projections in the proxy. And how were you misled by stopping in 2017? 2018. 2018, sorry. Right. Yeah. I don't understand the theory of the misleading. Even if we thought it was material, I don't understand how it's misleading. Well, the disclosed projections, we allege, were a lot lower than for the later years, again, because of the expected trends in the oil industry at that time. So our position is that those numbers would have supported a higher valuation, and that's also our position and what we allege with respect to the omitted transactions analysis. So the shareholders would have voted no? Well, we can't say, but that's also not the law. The Supreme Court's made clear in TSC Industries that information does not have to be outcome determinative in order to be material. The question is whether it would assume significance in the deliberations. Sorry, maybe I was unclear. I was assuming materiality. I'm trying to understand how you're misled. You thought that the number was X based on what they disclosed, but in fact, if you had known more information, you would have thought it was Y. So shareholders are trying to assess if the consideration they're getting is fair, and in order to make that assessment, generally, and we cite cases and authority in our brief, you need five-year projections. That's just kind of the standard in the industry. That's why J.P. Morgan needed all five years to conduct its fairness opinion. So our position is by stopping short, and especially in this case, because when they stopped short, the trend in those early years was going to be inconsistent with what was expected to happen later, shareholders were presented with a misleading overall picture of the company's trajectory, which ties directly to the value of their shares and the fairness of the merger consideration. And what is the best case you have for the proposition that if J.P. Morgan had it, whatever information J.P. Morgan had for its fairness opinion has to be disclosed in the proxy statement? I don't think that's our argument either, Your Honor. Okay, well, I'll take any case about what J.P. Morgan has to disclose based on its fairness opinion. So J.P. Morgan, it's not J.P. Morgan, by the way, it's the directors have an obligation to prepare the proxy and make sure it has material information. Fair point, I misspoke. What I meant is that 14A requires disclosure of information that J.P. Morgan used in formulating its fairness opinion. There is no explicit requirement. There's the general rule 14A9, which requires the disclosure of material information and prohibits the omission of material facts that would render something misleading. And so our position with respect to the transactions analysis, and again, I want to be clear, there's two distinct claims, one about the projections and one about the omitted analysis. But with respect to the analysis, again, the board elected to summarize J.P. Morgan's work in the proxy statement. And we think it's a materially misleading summary when you omit the valuation analysis that we allege would have called into question the fairness of the merger consideration that shareholders received. Let me ask you about that in particular. It seems to me that the hook that you have for saying the transaction analysis, you don't seem to be saying it needed to be attached to the proxy, but you wanted more information from what J.P. Morgan came out. There's a summary of two pages in the proxy of what J.P. Morgan's analysis was. Did you want more summary? And how do we know that would be required? Of course, we have pleadings. Did you want the entire analysis? How does that line draw on as to why more was needed? So the district court cited a standard that has made its way through some of the district court case law that's referred to as a fair summary. That principle emanates from Delaware case law, and we cited it in our opening brief. If that's the standard that applies, a fair summary requires disclosure of the key inputs and valuations that the banker performed. And here we know that the banker performed three analyses. Only two of them were summarized. You mentioned in the proxy, is that how you know that? Yes, that's correct, Your Honor. There was a sentence in the proxy that summarized the analyses that J.P. Morgan performed. Three were performed. Only two were summarized in the proxy, and we've alleged that the one that was omitted would have called into question the fairness of the merger consideration. And because of that, we believe it was material and should have been disclosed. I also want to put into context, and we think this was a critical error of the district court, this is a motion to dismiss. And the law is well established, and it emanates from the Supreme Court's opinion in TSA Industries that on a motion to dismiss, the question is whether the alleged omissions are so obviously unimportant that no reasonable mind could disagree. That's the standard that emanates directly from the Supreme Court's opinion, and we don't believe it was met here. We cite numerous cases from this court and courts across the country discussing the importance of projections to shareholders and cash flow projections to shareholders, particularly in the context of a merger when they have to decide whether or not to exchange their shares for the consideration they're being offered. We also cited an opinion from Delaware, the Glassman case, where a very similar type of analysis was omitted from a shareholder communication, and the court there denied both the motion to dismiss and summary judgment, finding that that type of analysis was at least arguably material to shareholders. And again, that's the question on a motion to dismiss. We weren't required to persuade the district court that these items were material as a matter of law, so we think the court got it backwards on that point. I'll turn to the safe harbor, and as an initial matter, defendants correctly concede that the safe harbor is inapplicable to the transactions analysis claim. That's on page 37 of their brief. The district court didn't apply the safe harbor to that particular claim, which we think was right. It did apply it to our claim premised on the omission of the projections. I think it's important to note that our theory of liability in this case is not that the disclosed projections were misleading because they ultimately failed to come to fruition. Those types of cases, they're referred to commonly as fraud by hindsight suits. You see them most often in the 10B context. We cited the quality systems opinion from the Ninth Circuit, where it explained that the purpose of the safe harbor was really to protect companies, it said, quote, when optimistic projections of growth in revenues and earnings are not borne out by events. And again, that's not our theory of liability here. Our theory is that they had six years of projections, and for some reason, they decided we're only going to show you 17 and 18, and again, we allege the later years would have painted a different overall picture of the company's value. And we argue in our briefs that the safe harbor wasn't intended to apply to this type of selective disclosure type of case. But it says by its own terms it applies to omissions. So and I think it's pretty well established that this is not a particularly well-written statute. It has caused courts. It does use the word omission. It does. How can we ignore that? So I want to make sure I'm looking at the text correctly, because that's where we start, obviously. And so it's C1 in general, and it's repeating language that is found in most of the security statutes, claims based on untrue statements of material fact or omissions of material fact. Our position is when you look later, though, and you get into the actual meat of the safe B, it's focusing on forward-looking statements that are identified as forward-looking and accompanied by meaningful cautionary language. And then B goes on to discuss statements that are made. So obviously an omission was not identified or accompanied by anything. It is by definition a statement that was not made or included in the proxy. So we do believe that the text, in addition to the legislative history, supports our position. And again, as far as the legislative history goes, we cited the Senate report, the House Conference report, which we believe makes clear that Congress really had in mind these 10B-5 fraud by hindsight cases, which is not our case here. Can we go back to the text real quick? Sure. If I understood your response to the Chief Judge, the word omission in the umbrella, C-1, doesn't have any meaning because if you look down in A and B, these are about affirmative statements. That's correct, Your Honor. So we just read omission out of the statute? Well, I'm not sure how to read it in because, again, how could an omission be accompanied or identified as anything? Well, I mean, one theory would be if you make an affirmative statement, but you fail to — if you affirmatively state A and you fail to state B, then perhaps A could be misleading because of the omission of B. And then the safe harbor would actually insulate A because it's accompanied by the relevant precautionary statements. That seems to square the statutory text pretty clearly, doesn't it? Okay. And if that's the case, we cite cases on page 33 through 35 of our brief in courts across the country that have held that the statute does not apply to omissions or to particularly omissions of present fact. And our position here is that you have to think of the numbers, the projections that we allege were omitted as presently existing facts in the context — Well, they're not — they're presently existing projections. They — that's correct, Your Honor. Right. Even you can't say that with this traitor. Certainly not, but — All due respect. I mean, you — I'm trying to tie it into our theory of liability, and I acknowledge that it becomes difficult given the — what we believe is the oddity of the text. But there are numerous cases that have agreed with our position, and we would ask this court to take a look at those, and we think it's a sound conclusion. But if the court disagrees, then it comes down to, well, was the cautionary language sufficient? That's the first question. And the district court concluded that it was, and we respectfully disagree. This court's opinions in Lormond, in Southland, in Rubenstein make clear that cautionary language, it needs to be substantive, and it needs to be specifically tailored to the particular risk at issue. And we don't believe such language was included in this proxy, and it was not cited by defendants or the district court. Essentially, the language they're citing is, again, language that would perhaps shield them from liability in a fraud by onsite case. It was that the projections are inherently uncertain, and they may not come to fruition. And everyone knows that. Shareholders recognize that. But again, that's not our theory here. Our theory here was that they withheld readily available numbers for the later years, and nothing in the proxy said something along the lines of, we have six years of projections, and the later years are significantly higher than the early years. Not in there. Perhaps that type of statement could have shielded them, but again, it's not there. So we don't think the language that the district court pointed to was sufficient, and we think our position is supported by this court's precedence in the cases I just mentioned. Now, if the court agrees that the cautionary language was not sufficient, the next question, presuming the safe harbor applies to the projections claim, is actual knowledge. Now, the district court didn't reach the actual knowledge issue. Defendants say we waived it, but we don't believe that's the case, because we're not required to, in our opening brief, identify all the possible reasons for affirmance, so we address it in our reply brief. And I think it's a pretty simple and straightforward analysis here, again, given the theory of liability. I don't think anyone disputes, and it's not reasonably disputable, that the defendants knew about the omitted projections. They were responsible for overseeing J.P. Morgan's fairness opinion valuations. There were numerous meetings between the board and J.P. Morgan. We allege those in the complaint. I'm actually, I was going to ask you about what you're alleging. So I'm looking at paragraphs 112 and 113 of the complaint filed on April 6th, 2018. Is that the relevant complaint? Is that the operative one, amended complaint, I think? Yes, your honor. So in paragraphs 112 and 113, you allege in the disjunctive that the defendants were negligent or knew. Okay, so this is an important point, actually, your honor. And the safe harbor, because we're, I see a, I'm going to continue because. You've got two minutes. The safe harbor pins knowledge in this context because it's a statement made by the company solely on an executive officer. And that's in C, B, subsection 2. And so it doesn't matter what the directors knew, it only matters what the CEO knew. And this particular paragraph, perhaps, was not the most artfully pled, but there are allegations in the complaint that at least the CEO knew that the projections for five years existed and that they had an obligation to review the proxy to make sure it was complete and accurate, and they did not. I'm not sure which paragraph you're referring to, but this one clearly isn't sufficient, right? I mean, we could agree on that, because if actual knowledge is required by the C2, or CB2. I mean, I understand that it's not well pled or artfully pled, but it does say new, I understand, or we're negligent or not knowing, so. And I'll reserve the last few seconds of my time for any rebuttal. Thank you. Good morning, Your Honor. If it may please the court, Peter Stokes, here to present argument for the appellees. The district court correctly dismissed this case and was absolutely correct in both of the grounds for dismissal. There were no material misstatements, and the safe harbor borrows all liability other than for the transactions analysis claim. And Judge Oldham, to square the statute with respect to both points, this court has repeatedly and consistently held in the 10B5 context that you can't just have a pure omission claim. It has to be a misleading statement claim. That's in the R2 investments case and the Shaw Group case. And the Supreme Court in the Omnicare case applied that specifically to section 11. And courts, unsurprisingly, have looked at the 14A language, which is very similar, and have applied the same construction. And so plaintiffs have not alleged a materially misleading statement. And I think that squares the statute with respect to the safe harbor because there are no, omissions have no significance under 14A apart from the extent to which they render an affirmative statement misleading. And so it's not surprising that the safe harbor is drafted the way it is. It applies to statements, which are the only possible basis for a claim. And a plaintiff cannot end run the safe harbor by trying to fashion an omissions claim. In this case, the alleged omissions themselves are forward looking statements. They're projections, and Congress expressly provided that this applies to any private action under this chapter, meaning the Exchange Act, which includes 14A claims. The fact that Congress was concerned at the time with a large supply of 10B5 cases is not inconsistent at all with wanting to apply the safe harbor across the board to all securities class actions that could be brought under the Exchange Act. There is no inconsistency and the plain language of the statute controls. And so under the statute's plain language, the safe harbor applies to all the forward looking statements. It applies to the DCF calculations, discounted cash flow, which themselves are estimates of forward looking statements. And even if the safe harbor didn't apply in this case, Judge Bennett was absolutely correct in concluding that there is no allegation of a misleading statement in the first instance. Plaintiffs say, now by, we have the advantage of hindsight now looking at how the oil markets have done in the past few years. Judging by the bankruptcy docket right now in the southern district of Texas, unfortunately projections don't always work out in this industry. And these companies are both in the same industry, and this was a stock for stock transaction. So both companies were affected by it. There's no allegation that one side was uniquely affected and it would have changed the ratio in terms of the exchange. So across the board, there is no materiality with respect to the projections. The safe harbor applies. And with respect to actual knowledge, this court has, again and again, under a recklessness standard in the 10B5 context, affirmed dismissals involving far more particularized facts than what we have here. Contrast this to the Anadarko decision from December. There were dozens and dozens of paragraphs in that complaint, far more specific than this one, and that didn't show severe recklessness. This case certainly does not show actual knowledge. And then the only claim in this case that we have not alleged is covered by the safe harbor is the transaction analysis claim. And that's simply an allegation by the plaintiff that the company had a duty to disclose what premiums were in other transactions across the board. And I think, not only is there no allegation showing that a misleading statement was made with respect to any premiums in other transactions, but that's an area, Judge Oldham, to your question about a limiting principle. There'd be no limiting principle whatsoever if a company had a duty to scour public markets and make affirmative disclosures about what premiums were in other transactions. This proxy accurately disclosed what the premiums were in this transaction. There's really no allegation that any of the data disclosed in this proxy were untrue. And the Omnicare case, back to the material misstatement issue, Omnicare said to show an admission claim, a plaintiff has to plead particular and material facts that render the affirmative statement misleading. And simply speculating that some other projection might lead somebody to a different conclusion, or that some other piece of information might have that same effect. Again, there's no limiting principle involved. It would allow plaintiffs to end run the pleading standards in these cases and would drain the PSLRA of any meaning. I'd like to conclude if the court has, unless the court has questions about those two grounds. There are a couple of points with respect to Nabors itself I'd like to address. The plaintiffs have argued on appeal that Nabors somehow should be deemed a signer itself of the proxy. And that Nabors is not itself entitled to claim the forward looking statement safe harbor. Both of those contentions fail. There is no well-plaid allegation in the complaint that Nabors distributed or signed this proxy. It was a Tesco proxy. The proxy's in the record. The first page is executed by Tesco management. It's directed to Tesco shareholders to vote on it. We would also contend that this issue wasn't, it was not pled. The only allegation is that defendants as a group issued the proxy, and that's just a conclusory allegation that is not entitled to deference. And then this allegation that Nabors wasn't entitled to claim the safe harbor. That, first of all, we think that was waived below and was not briefed or alleged below in the district court. It cannot form the basis for an appellate argument here. But even if it could, the fact that there are no allegations showing that Nabors itself issued the proxy renders it moot. Because there's no allegation that Nabors made the statements at issue in this case. These were Tesco statements and a Tesco proxy. Tesco was entitled to claim the safe harbor. And there are no allegations in the complaint showing that even if Nabors itself had issued the proxy, that Nabors would not be entitled to claim the safe harbor as well. This was presented for the first time on appeal. It's an incorrect argument, and we submit it does not provide a basis for reversal. And if your honors have no further questions, I will yield the balance of my time. I have one quick one. I understand from your brief that there's no legal basis to challenge the disclosure of the information given to JP Morgan for the fairness opinion. What I'm, it's not obvious to me why that's true. I've read a couple of the cases that you've cited, I can't say I've read all of them in detail. Can you explain to me why? I mean, if you give five years of data to JP Morgan so that they can then provide a fairness opinion, I would think you wouldn't want to disclose two years and not the other three. There are a couple of reasons, your honor, for that. Number one, the story with the federal statute, it's a misleading statement statute, so there has to be a misleading affirmative statement in the first instance. There are Delaware cases, as I think you've seen in the briefing, where in a cash-out merger, where shareholders are being asked to give up their shares for cash, that that scenario that you described, there are some Delaware cases that have said, there you may have a freestanding duty to disclose that. That has not translated into the 14A realm, and especially in the stock-for-stock transaction realm. There are a number of cases that say that that should be limited to the Delaware realm and to the cash-out realm. And one of the interesting facts in this case is that this is an Alberta company. There is a proceeding in Alberta, it's described, I think, in the opinion in the record, where the court in Alberta has to approve the arrangement, and they have to approve the proxy disclosures that go out, and the judge has to supervise it, and the deal is not done until the judge agrees. And the plaintiff did not intervene in that matter, and so that would be the place, in our view, to raise the argument that there's a stricter duty under the law of the state of incorporation to disclose more facts. But in the federal context, they have to plead a material misstatement under 14A, and even if they, you know, we again don't think they do that, but the safe harbor itself plainly applies to a claim that disclosing additional projections from a forward-looking disclosure of projections falls squarely within the safe harbor. We think, by the way, page 36 of our brief addresses the cautionary language issue, and the plaintiff's primary argument on that was that we didn't disclose favorable oil price trends in 2019. In fact, the specific risk of commodity price trends and volatility is expressly disclosed in the proxy, and that's cited on page 36 of our brief. Thank you, Your Honor. I know I don't have as much time, so I'll be quick. We all agree safe harbor does not apply to the transactions analysis claim. We've got a case on Point Glassman that says it's material. We think that's sufficient, certainly on a motion to dismiss. The claim against neighbors is premised upon the use of name theory. That's a distinct theory of liability. It flows directly from the text of section 14A. We cite cases in our brief, including from the D.C. Circuit, that we think are on point, and we would ask the court to follow those cases, and we do think there's a basis for liability against neighbors. And with respect to actual knowledge, getting back to Your Honor, I admit that the complaint was perhaps not artfully pled because we were not sure about the applicability of the safe harbor, but 110 and 111 allege that each defendant reviewed and authorized the proxy, and 111 alleges that each of the defendants was aware of the omitted information. Also, the proxy makes clear, and it's incorporated into the complaint, that the fairness presentation was presented to the entire board. So I don't think there's any legitimate dispute that certainly the CEO knew of the omitted projections. And lastly, we did ask leave to amend. So if the court finds that our complaint was not properly pled, we do believe that we should have been given leave to address the court's concerns, unless the court has any questions. Thank you.